GUY A. THOMPSON, TRUSTEE, NEW ORLEANS, TEXAS & MEXICO RAILWAY COMPANY v. JAY LEE GIBSON.*

No. A-5912. Decided January 23, 1957.
Rehearing overruled February 27, 1957.
(298 S.W. 2d Series 97).

*Reversed and remanded by Supreme Court of the U. S. 355 U. S. 18, 78 Sup. Ct. 2, 2 L. Ed. 2d 1. (See 158 Texas_____, 310 S.W. 2d 564).

594

*Hutcheson, Taliaferro & Hutcheson, Woodul, Arterbury &*

*Wren, Carroll R. Graham* and *Howard S. Hoover,* all of Houston, for petitioner.

The Court of Civil Appeals erred in failing to hold that as a matter of law there was no evidence which would permit, or support a finding of negligence against petitioner Thompson, as trustee of said railroad, or to support a finding that any act of the petitioner was a proximate cause of the injury. Cotton Press & Mfg. Co. v. Bradley, 52 Texas 587; Collins v. Pecos & N. T. Ry. Co., 110 Texas 577, 212 S.W. 477, 222 S.W. 156; Wisdom v. Smith, 146 Texas 420, 209 S.W. 2d 164.

*Doerner, Rinehart & Stuart,* of Tulsa, Okla., *Parks, Cire & Jamail* and *George E. Cire,* all of Houston, for respondent.

In reply to petitioner's points cited Port Terminal Railroad Ass'n. v. Ross, 155 Texas 447, 289 S.W. 2d 220; Fleming v. Husted, 164 Fed. 2d 65.

MR. JUSTICE SMITH delivered the opinion of the Court.

This is a negligence case in which respondent, a locomotive engineer, brought suit under the Federal Employers' Liability Act, 45 U.S.C.A. Sec. 51 et. seq., against the petitioner, and two other railroad companies, seeking damages for injuries suffered as a result of failure to provide respondent with a safe place to work. It was alleged that the respondent was injured on December 5, 1950, and that at that time he was an employee of one or more of the defendant railroad companies, and that Guy A. Thompson was the Trustee for each of said companies. The cause was tried before a jury which returned a verdict in favor of the respondent. Based on the verdict, the court entered judgment in favor of the respondent and against the petitioner. The court rendered judgment that respondent take nothing as against the other railroad defendants. This action is not involved. Petitioner perfected an appeal to the Court of Civil Appeals for the First Supreme Judicial District of Texas. This court, under the rule authorizing equalization of the dockets of the several Courts of Civil Appeals of Texas, transferred this cause to the Court of Civil Appeals in and for the Second Supreme Judicial District of Texas. That court has affirmed the judgment of the trial court. 290 S.W. 2d 305.

Respondent in his petition alleged in general terms that while discharging his duties as a railroad engineer for petitioner and at about the hour of 1:40 a.m., December 5, 1950, he

was"walking from the roundhouse at Settegast Railroad Yards to his engine which had been 'spotted' at a point some distance from the roundhouse, when because of the unsafe conditions of the railroad yard, it having been covered with a large amount of loose gravel made up of large and small stones, the plaintiff was cause to slip and fall," resulting in serious and permanent injuries. These general allegations were followed by allegations of specific acts of negligence on the part of the petitioner charging that respondent's fall and resulting injuries were caused by nine specific acts of negligence, and that each and all of said acts of negligence, separately and concurrently, were a proximate cause of the respondent's fall and of the injuries suffered and sustained by him.

The nine acts of negligence were alleged as follows:

"1. In spotting the engine which the Plaintiff was to operate in an unsafe place under the circumstances and conditions then existing.

"2. In requiring the Plaintiff to walk from the roundhouse across the yard to his engine under the circumstances and conditions then existing.

"3. In covering the railroad yard about and between the tracks where Plaintiff was required to walk with large and small pieces of stone.

"4. In failing to use gravel of uniform size about and between tracks where Plaintiff was required to walk.

"5. In failing to firmly pack the gravel about and between the tracks at the place in question.

"6. In failing to properly illuminate that portion of the yard which Plaintiff was required to use in carrying out his duties.

"7. In failing to properly illuminate that portion of the yard where Plaintiff slipped and fell.

"8. In failing to provide a smooth walkway or path across the yards to the place where the engine was spotted.

"9. In failing to furnish the Plaintiff with a safe place to work."

The jury found that the petitioner was negligent: (1) in requiring the respondent to walk from the roundhouse across the yard to his engine under the circumstances and conditions

existing on the night in question; (2) in failing to use gravel of uniform size about and between the tracks where the respondent was required to walk; (3) in failing to firmly pack the gravel about and between the tracks at the place in question; and (4) in failing to provide a smooth walkway or path from the roundhouse across the yards to the place where the engine was "spotted."

Since this is a "no evidence" case and is an action under the Federal Employers' Liability Act, we deem it not only necessary to discuss the evidence or lack of evidence and its effect but to lay down the rules governing our decision.

The safe place to work, which the petitioner was under a duty to furnish respondent, involved in this case is Settegast Yards. The evidence relative to the manner of construction of the yards is substantially without dispute. The Yards were comparatively new and the evidence shows that these Yards were constructed by the use of the latest techniques and methods and the plans and specifications followed were approved by the American Railway Engineers' Association; that the Association referred to is a national organization. C. R. Dubose, a witness called by the petitioner, testified:

"My name is C. R. Dubose; I am employed by the New Orleans, Texas & Mexico Railway Company and have been since 1924 as a civil engineer. My work primarily involves track construction, industrial track yard design and terminal design, freight and passenger terminals. In 1948, '49 and '50 I was resident engineer on the construction of Settegast yards, here in Houston."

"Please tell the jury something about the planning and construction of that yard.

"A.  Well, it was designed as a freight terminal under the A.R.E.A. specification and practice.

"Q.  What is the A.R.E.A.?

"A.  That is the American Railway Engineering Association, of which I am a member. It is primarily a freight yard and laid out on that construction.

"Q.  Were those plans and specifications that you followed, were those approved by the American Railway Engineers' Association?

"A. Yes, that was the standard practice and specification that we followed in the design and construction of that yard.

"Q. Is that Association, the A.R.E.A., is that local?

"A. No, sir, it is national.

"Q. Of what is it composed?

"A. It is composed of railroad engineers over the United States, mostly in a supervisory capacity. To be a member of the A.R.E.A. you must meet certain qualifications by having so many years experience in this certain field, not followed by other engineers?

"Q. These specifications used in the construction of that yard, was that the best thinking of engineers developed in the construction of railroad facilities?

"A. That is true. The specifications and general plan are an accumulation of committee reports. We have committee reports on various phases of railroad construction, and they are compiled in the committee reports that are available to all members."

"The Ballast used in the yards was pit run gravel. The specifications were that it must pass a 2 inch screen. It would eliminate rocks that would not pass a 2 inch screen. The first six inches of gravel was spread by draglines, and bull dozers over the entire area. The tracks were built on this six inches of gravel. Additional gravel was then unloaded from hopper bottom cars, making 12 inches of gravel, then it was levelled off between the rails to the top of the ties. The gravel was tamped immediately in the tracks. There was no tamping between the tracks. The only tamping along the track was by a machine. At that time that was the best known specifications and plans that we had to follow and we followed them. The gravel as it was put in was levelled off even with the ties. As the gravel picks up soil and dirt it becomes more solid. It is rather loose when it is put in but it acquires soil and dirt."

"Q. You have walked in the yard at night when the lights were on?

"A. Yes, I have walked it many times. Being resident engineer I have been there many times.

"Q. Tell us about the gravel after it was first installed.

"A. It was pit run gravel and it was hard walking, but I wouldn't say that it was dangerous. It was just like gravel in the fill of any road, and I have walked back and forth quite a number of times through there.

"Q. The lights, then, the lighting of the yard and the gravel type of construction of the yard, the method that the gravel was placed in the yard, did all of those things meet all of the specifications that you engineers had access to at the time?

"A. To the best of our ability and knowledge at that time."

"In the period from June to December, the gravel would tend to sink and become more solid because as you use it and walk over it, the vibrations of the train would tend to set the gravel up more than when it was put in. We use gravel out of the same pit that this came from in other yards on the line to Brownsville."

"On cross-examination the witness testified as follows:

"There was 12 inches of pit run gravel spread over the yard and leveled off between the rails to the top of the ties. It was standard gravel."

"Q. You are not testifying there were not some rocks out there as big as my fist?

"A. In all of our specifications we do not have anying that would not pass a two inch screen, and we tested samples to see if it met specifications.

"Q. There could be rocks as big as my fist?

"A. I don't see how there could be, because you can't tamp them. You have shovels and machines that push the gravel under the tie and if you put those big rocks in there they would not hold because of the vibrations. They would stick down and would not hold."

The yards had been in use about six months at the time of this accident. Respondent had, for several years, been assigned to the freight service running between DeQuincy, Louisiana, and Houston, Texas, and he had been operating into and out of Settegast Yards since the Yard had been open on an average of three times a week. Settegast is a large freight yard divided

into three section — "A," "B," and "C." There are numerous tracks in the yard and these tracks run in approximately a north and south direction. The usual location for spotting trains going to DeQuincy was in "C" yard, about 900 feet west of the roundhouse. It was this distance from the roundhouse on the east to the locomotive spotted in yard "C" on the west side of the yards which respondent was required to walk. On the night in question, respondent had been to his locomotive having walked the distance of 900 feet from the roundhouse through yards "A," "B," and "C" to the point on the west side of "C" yard without mishap. Respondent returned to the roundhouse to answer a telephone call and it was on the return trip to the locomotive while passing through Yard "B" that the fall and resulting injuries occurred. In regard to the fall and the physical condition of the yards, the respondent testified as follows:

"As I was going back to the engine I was walking and zig-zagging through the yard where the cars were standing, walking around where they were switching cars back and forth, kicking them down the the lead, to avoid those cars, and as I went back I was getting pretty close to the engine and I fell by stepping on a round rock that slipped my foot under the web or base of the rail and it caught me because I was off balance, and I tried to pull against it, and that foot was in there tight, and this foot was in the center of the track to keep from falling, and the round gravel slid out from under me, causing me to twist as I fell. I had my gloves on and this hand went right down between the rails, with my head between the ties, and it flopped my head back to the center of my back, — it just popped, and as this knee went down I got a big gash on my knee. It was all bruised up and a gash cut in it."

"On cross examination Respondent testified with respect to his falling as follows:

"Now, in walking back across there you had walked quite some distance before, as you explained it, you slipped on a rock?

"A.  Yes.

"Q.  Did there seem to be any difference in the feel of this rock you slipped on and any of the other rocks you had been walking over?

"A.  Well, yes — the only way I can explain it, Mr. Hoover, in terms of my language.

"Q. Well, that is the way I want it.

"A. Well, I couldn't explain it in a lawyer's language.

"Q. I don't want you to.

"A. All I can do is give you approximately in all of the railroad slang I know. When I slipped on that rock it shot my foot sort of quick, that was the difference in time, it was quicker, and I lost my balance by my foot going under the web of the rail, and I fought against it and I just went over.

"Q. Which foot stepped on that particular rock?

"A. The right foot."

"Q. Had they held you pretty well in walking across the ground, had you slipped out there before?

"A. The gravel did work under you, yes.

"Q. It worked under your feet because it was loose?

"A. Yes, sir.

"Q. The difficulty, however, was when you stepped on this particular rock you slipped?

"A. Well, it just shot me, just like a man would be if a calf was throwed.

"Q. Did your right foot catch under the rail?

"A. It went under the web of the rail. It caught my toe under the web, and it was caught by the gravel, and I couldn't get it out.

"Q. Then your left foot came around?

"A. Yes, I was in motion and it went in between the rails and hit, I imagine, on the tie with that little round gravel, and when it did that, that little round gravel let it go plumb out because this foot was hung and it had a pressure trying to get this one loose. It was sort of like roping a calf.

"Q. You had one foot hung under the rail, and this foot went across and hit in between the rail?

"A. Yes, sir.

"Q. Then you fell forward?

"A. Yes sir."

"Q. Could you tell from the feel whether the rock you stepped on was on the tie or in between the tie?

"A. No, it was not on the tie, I don't think so.

"Q. Then it must have been in between the ties, at the end of the rail.

"A. It could have been. This gravel had clear places in it. The gravel would be over the tie, and in other places you couldn't see the tie. *It was characteristic of a railroad yard.* I am sure you understand, I don't know about the jury.

"Q. Could you see the particular area you were stepping on?

"A. It looked solid enough for me, but just like I say, this particular rock I stepped on rolled across my foot to slide in under this web of the rail and it hung."

"Q. Was there anything about this particular rock, was there any oil or grease on it to make it slicker than normal?

"A. There could have been grease on it. I didn't stop to inspect it."

"Q. I believe you said you never saw the particular rock there before or after?

"A. No.

"Q. And the only way you can describe it is how it felt on the sole of your foot and the way it reacted when it scooted out from under you?

"A. That is all I know."

It will be noted from the foregoing excerpt that there is no contention made by Respondent that there was any depression or unevenness in the yard. The only cause of the fall was the rolling of rock upon which he stepped.

"The yard was covered with gravel a foot thick at most places. It was laid on prairie land and was scattered on there heavy for the weather and stuff to pack down. It consisted of wash gravel from boulder size down to small gravel; what I would call wash gravel with clay in it, it was heavy throughout the entire yard. Awfully hard and heavy to walk in.

"The heavy gravel was awfully hard to walk on. Your feet would sink in it, it was rolling and hard to walk in. Any gravel

is hard to walk in, whether there or in any place. When you are coming into the yards (off of a run) you can walk down the leads, which is easier than walking across the tracks. It is rougher walking across the tracks than down the tracks. Since this was a new yard the gravel was loose. I walked on it and all the other men walked on it.

"Q. Have you seen any of the other boys fall?

"A. I wasn't looking for anybody to fall on it."

"The condition in Settegast yards was different from other freight yards in that they did not have *that much* loose gravel in other yards."

Pat D. O'Connell a witness called by the respondent, testified in regard to the condition of the yard as follows:

"I am a locomotive engineer for the New Orleans, Texas and Mexico Railway Company and have been since 1941. My run is between DeQuincy and Houston and on that run we enter and leave out of Settegast yards here in Houston.

"I am familiar with the condition of the Settegast yards as it existed December 5, 1950 between the area of the roundhouse and where the engines were spotted in "C" yard. I walk over that area every trip. It was a brand new yard and it was covered with pit run gravel. There was no path for us to walk on. Loose gravel is a dangerous proposition whether you are walking or driving a car on it. You *will fall if you are not careful*. I fell one night when I stepped on a rail and had on hard sole shoes."

He further testified that it was loose gravel, not packed down; that in his forty-five years of railroading he had been in and out of about one hundred railroad yards and this condition did not exist in the other yards.

"This condition was not common to all the other railroad yards that I have seen. All the others have been *older yards and they were gravel but the gravel had packed more or less.*" (Emphasis added); that everybody knew the condition of the yard well enought that they dreaded walking across there.

Troy G. Walker, another witness called by respondent, testified.

"Q. Will you describe to me generally the condition of Settegast Yards in the area between the roundhouse and "C" yard on December 5, 1950?

"A. Well, on the "C" yard it is loose gravel, very loose and pretty good-sized rocks. The "B" yard is not as bad as "C" yard, and from "B" yard over to the roundhouse it is good walking.

"Q. Was that gravel spread on heavy or thin?

"A. In my opinion it was heavy."

John B. Hill, a former employee of the I. & G.N. Railroad, and who had worked at Settegast Yards as a car inspector from the time it opened until sometime in 1951, was familiar with the area from the roundhouse to "C" yard. He testified that the yard was covered with big gravel and that, as you would walk through it, you would take a step and slip.

Respondent argues that a peculiar situation exists in Settegast Yards, in that the usual situation in such yards is for the engineer to move the engine out of the roundhouse, but by contract agreement between Settegast Yards and the hostlers, the locomotive engineers who were to take the trans out of Settegast Yards were not permitted to move the trains from the roundhouse to the place where the freight train was made up. This was done by the hostlers, hence the petitioner was guilty of negligence in requiring the respondent to walk from the roundhouse across the yard to his engine where it had been spotted by the hostlers. In this connection, we point out that although respondent charged the petitioner with negligence in spotting the engine which he was to operate in an unsafe place, no issue was submitted or requested to be submitted thereon. Respondent further contends that in addition to the so-called peculiar situation or arrangement mentioned above, certain other facts render it impossible for this Court to say, as a matter of law, that petitioner provided a reasonably safe place to work. A summation of such contention is found in his answer to the application for writ of error, and reads:

"* * * Add to this the fact that this situation was not made known to the construction engineers at the time they were drawing the plans and specifications for Settegast Yards. And, further, consider that though the resident civil engineer thought there would be provision made for the engineers to walk from the roundhouse to their engines, the railroad for a period of

six months, continually required their employees to walk this distance without making any provision for their safety. One employee described the condition at Settegast Yards as the worst he had ever seen, and another stated that everybody that customarily walked in the yards knew the condition of the yard well enough that they dreaded walking across there. In the light of such testimony, the jury, the trial judge and the Court of Civil Appeals, found that the Petitioner had not complied with its duty to furnish the Respondent with a reasonably safe place to work. And, of course, the very thing that should have been anticipated, that is, that in slipping and sliding in the loose gravel, someone would fall and be injured, did finally on December 5, 1950, occur.

"To say as a matter of law, that Petitioner provided a reasonably safe place to work is to say that there was no evidence to show that a man's feet would slip and slide and the gravel would roll under his feet as he walked. And further, to say that Petitioner acted as a reasonably prudent employer, even though it made no provision for its employees to walk this distance, is to completely reject the reasonable inference to be drawn from Mr. Dubose's testimony that he thought some provision would be made for them.

"Petitioner strongly relies on the fact that the railroad yard was constructed according to specifications laid down by the American Railroad Engineers Association. But, the record affirmatively shows that this association in setting out these specifications was not advised that men would be required to walk from the roundhouse to "C" Yard. Therefore, the fallacy in Petitioner's argument, is that although the yard was undoubedly a safe yard for trains, this does not make it suitable for the purpose for which it was necessarily employed by the Respondent and other engineers, namely, as a walk-way.

"As the court in Fleming v. Husted, (8th Cir. 1947), 164 Fed. 2d 65, p. 66, stated:

'and the trustee's duty under the Federal Employers Liability Act was to exercise reasonable care to try to make the platform generally safe for all the uses for which it was intended or permitted to be a facility in the course and scope of its employees' duties.' "

■ The petitioner's points one and two challenging the judgments of the trial court and the Court of Civil Appeals on the

ground: (1) that as a matter of law there was no evidence which would permit, or support, a finding of negligence against petitioner, and (2) that as a matter of law there was no evidence which would permit, or support, a finding that any alleged negligent act or omission on the part of petitioner was a proximate cause of respondent's injuries, must be sustained. Under the Federal Employers' Liability Act, petitioner has the duty to use reasonable care to provide respondent with a reasonably safe place to work. In the recent case of Port Terminal Railroad Association v. Ross, 155 Texas 447, 289 S.W. 2d 220, this Court announced that "Until required to do so by a clear and positive declaration of the highest federal tribunal, our trial and appellate courts cannot and should not give effect to a jury finding of negligence when in its opinion the record is completely devoid of evidence in support of same." The Act requires a finding of negligence, which is supported by the evidence.

While we recognize that the question of what constitutes negligence, and the sufficiency of the evidence to raise the question for the jury is to be determined by the applicable federal dcisions, we adhere to the rule that this Court in determining the question of no evidence reserves the right to appraise the evidence in accordance with the concept of negligence as announced by this Court in prior cases. The trial court in its charge defined negligence and proximate cause and the definitions given were the same as have been given in this jurisdiction and approved in common law tort actions. In the case of Great Atlantic & Pacific Tea Company v. Evans, 142 Texas 1, 175 S.W. 2d 249, this Court held that negligence rests primarily upon two elements: (a) reason to anticipate injury, and (b) failure to perform the duty arising on account of that anticipation. The term "negligence" means the doing of that which a person of ordinary prudence would not have done under the same or similar circumstances, or the failure to do that which a person of ordinary prudence would have done under the same or similar circumstances. The question of no evidence of negligence is one of law to be determined by this Court. It is well settled that even though injury may result from a person's act or omission, the actor is not to be held responsible if he could not have reasonably foreseen the resultant injury, or injuries, similar in character, it is unrealistic to say that the liberality of the federal decisions on questions involving the great weight and preponderance of the evidence shall govern this Court in determining a question of "no evidence." The principal question for us to determine is: What constitutes a reasonably safe place

to work and was the petitioner negligent in failing to furnish the respondent a safe place to work. We disagree with respondent's contention that this question is to be determined by federal decisions alone. The question is to be determined by the evidence in the light of the trial court's charge and the decisions pertinent to the particular question involved. The proper test to be applied is the one stated by the trial court, which was in effect, that in determining liability were the facilities provided or was the place to work such as a person of ordinary prudence would have provided under the same or similar circumstances, having in mind the employer's duty to furnish a safe place to work. See Chicago Great Western Railway Company v. Smith, 8th Cir., 228 Fed. 2d 180. If the employer knows, or in the exercise of ordinary care should know that prevalent conditions are inadequate to protect his employees from injury, then negligence, within the meaning of the Federal Employers' Liability Act, attaches. See Urie v. Thompson, 337 U.S. 163, 69 Sup. Ct. 1018, 93 L. Ed. 1282. These same rules of law were followed by this Court in determining the "no evidence" question involved in the case of Hopson v. Gulf Oil Corporation, 150 Texas 1, 237 S.W. 2d 352.

■ Thus, we have federal decisions and state decisions determining "no evidence" questions by using the same settled rules of law. We also recognize the rule that a court in a Federal Employers' Liability case is required to take a liberal view of the scope of permissible inferences open to the jury. However, we draw the line if such rule means that the jury is to be permitted to draw inferences not based on fact. In holding that the record is devoid of evidence showing negligence on the part of petitioner in furnishing respondent a safe place to work, we are not unmindful of the rule that the petitioner must show that reasonable-minded men could not draw different inferences from the evidence. See Tiller v. Atlantic Coast Line R. Co.. 318 U.S. 54, 63 Sup. Ct. 444, 87 L. Ed. 610.

■ We hold there is no evidence to warrant a finding that petitioner was guilty of any breach of duty owed to respondent with respect to the method and manner and material used in the construction of Settegast Yards. Petitioner in building the yards in question was using plans and specifications advanced and approved by the best qualified construction engineers in America. The very basis of respondent's cause of action is the charge that his injuries and damages were sustained because of the unsafe condition of the railroad yards due to the use of loose gravel or stones in the construction of the yards, and the jury

findings of negligence all pertain to the loose gravel. There is no evidence that anyone had ever made any complaint to petitioner regarding the condition of the yard and there is no evidence that petitioner had knowledge that anyone had ever fallen while working in the yard. It is true that the record shows that one witness testified that he fell while stepping on a rail, and another testified as to stumbling and falling, but we regard such evidence as not controlling since they involve different factual situations. The standard to test the question of negligence vel non is the common experience of mankind, and implies generally the want of that care and diligence which ordinarily prudent men would use to prevent injury under the circumstances of the particular case. Great Atlantic & Pacific Tea Company v. Evans, supra. The question of the existence of negligence and its degree depend upon the facts and circumstances of each case, and the inferences to be drawn by the trier of the facts therefrom. We hold that the evidence wholly fails to produce any reason for petitioner to anticipate injury to an employee who could as the respondent give his undivided attention to walking, The fact that the gravel was about 12 inches deep and loose and thereby rendered it inconvenient and more tiresome for the respondent to negotiate the distance from the roundhouse to the engine, does not give rise to an anticipation of injury. The duty resting upon the employer, the petitioner in this instance, was to furnish a safe place for the employee, respondent, to work, not to furnish an easy and convenient place. While the facts are not exactly similar, we think the rule announced in the recent case of Rogers v. Thompson, Trustee, Missouri Pacific Railroad Company (Sup. Ct. Mo. 1955), 284 S.W. 2d 467, 472, has some application here. The negligence alleged against the defendant in that case was permitting loose gravel to remain on a culvert over which plaintiff was forced to work. In holding against the contention of plaintiff, the Court said in part:

"In our case, plaintiff's testimony leaves much unsaid as to the actual condition at the west end of defendant's drainage culvert, and as to the place where defendant was stepping when he fell. Plaintiff's testimony at best tends to show the fact that generally there was a level shoulder between the edge of the ballast and the crest of the dump supporting defendant's tracks. This level shoulder was supposed to be kept there so that section men might have a safe place to walk when working. There were flat surfaces across the ends of culverts, but not 'like' the shoulders were. Considered from a standpoint most favorable to plaintiff, it reasonably could be said the flat surface

across the west end of the culvert in question was narrower than elsewhere along the shoulder, and the vibration of trains had loosened and shaken down some gravel or crushed rock so as to make an inclined surface down to or near the end of the culvert. Plaintiff's testimony, which we have quoted in question and answer form, supra, was support for a conclusion that plaintiff slipped on gravel 'right up next to the ties'; however, at another time while testifying, plaintiff said 'I didn't back up east, next to the rails.' Even so, the condition of the culvert was not shown to have been unsafe for workmen in the ordinary use of the area in maintaining the tracks, including the firing and attending the firing of 'spots' of weeds along the shoulder and incline of the dump. Can it be correctly said that a reasonably careful and prudent person would assume that loose gravel or crushed rock, shifted down on the shoulder at the culvert by the vibration of trains, would subject section men to an unreasonable hazard, accustomed as section men are to moving over tracks, ties and ballast in their multiple duties in the maintenance of the line? It is established that the standard of care must be commensurate to the dangers of the business. Less diligence is required where the danger is slight than where great. Frizzel v. Wabash R. Co., 8 Cir., 199 Fed. 2d 153."

There is no evidence in the present case that the method of construction used in constructing the Settegast Yards was not suitable or that there was in use by respondent or any other railroad company any different method of construction of freight yards which involved less danger of injury to their employees than the methods used in the instant case. There is no evidence that any railroad company undertook to pack the gravel at the time of construction of the yard. We think from the evidence it is a fair deduction to say that all railroad yards were originally constructed by the use of loose gravel, and that the element of time was responsible for the fact that a portion of the gravel became packed. The respondent does not suggest in his pleadings that some material other than gravel should have been used.

Since we have held that the record is devoid of evidence supporting the jury findings of negligence on the part of petitioner, it necessarily follows that the judgments of the trial court and the Court of Civil Appeals must be reversed and judgment entered that respondent take nothing. It is so ordered.

Opinion delivered January 23, 1957.

Rehearing overruled February 27, 1957.