Anastacio R. HERNANDEZ, Appellant,

v.

SOUTHERN PACIFIC TRANSPORTATION COMPANY, Appellee.

No. 1857cv.

Court of Appeals of Texas,
Corpus Christi.

Sept. 9, 1982.

Jack Skaggs, Alex Huddleston, Skaggs & Huddleston, Harlingen, for appellant.

W.T. Womble, Crain, Canton, James & Womble, Houston, Jack Carinhas, Jr., Carinhas & Morrow, Brownsville, for appellee.

Before BISSETT, UTTER and KENNEDY, JJ.

## OPINION

KENNEDY, Justice.

This is a personal injury suit based on allegations of both negligence and strict liability in tort. Appellant was employed by Southern Pacific Transport Company of Texas & Louisiana (Southern Pacific) as a "city driver." Southern Pacific, a trucking company, is a wholly owned subsidiary of Southern Pacific Transportation Company (commonly known as the Southern Pacific Railroad, which will be referred to herein as "the railroad"), appellee in this Court. (While Southern Pacific is a wholly owned subsidiary of the railroad, it is a distinct and separate corporate entity.) Appellant sustained injuries when a stanchion on a flatcar, delivered by the railroad to Southern Pacific, collapsed and fell on his leg while he was in the process of lowering the stanchion for the purpose of unloading trailers during the course of his employment.

The stanchion which caused the injury is a mechanism on the flatcar which serves to secure trailers on the car. The lowering of the stanchion is essential to the completion of the unloading process. It is normally accomplished by the use of an electric wrench which is inserted into a socket attached to the end of a threaded shaft called an "elevating screw" in the base of the stanchion. The electric wrench operates in the same manner as does an electric drill, turning the elevating screw and thereby lowering the stanchion. At some point the socket became detached from the elevating screw, and appellant attempted to lower the stanchion by use of a pipe wrench clamped onto the elevating screw itself. After turning it two or three revolutions, the entire stanchion, suddenly and without warning, collapsed.

There was testimony by an expert witness to the effect that the propensity of this particular type stanchion (AFC Model 2) to collapse in this fashion under these circumstances is due to a defective design. Two expert witnesses who had been employed by the railroad in managerial positions testified to having known, during the periods of their respective employments, of the tendency of the AFC Model 2 to so behave.

The stanchion was manufactured by AFC Industries, Inc. (AFC), and owned by Trail-

er Train Corporation (TTX), neither of which were parties to this suit. The railroad, in turn, leased the flatcar from TTX.

In response to special issues the jury found, inter alia, that the railroad failed to issue warnings or instructions to its employees regarding attempts to lower a stanchion in the absence of a socket properly affixed to the end of the elevating screw, and that such failure was negligence and a proximate cause of appellant's injuries; that appellant was negligent in working with the railcar stanchion after he had notified the railroad of the existence of a mechanical malfunction, and that such was a proximate cause of his injuries. The jury then found that 5% of the negligence which caused the accident was attributable to the railroad, and 95% to appellant. Due to the finding on this comparative negligence issue, a take nothing judgment was rendered in favor of the railroad.

In his first two points of error appellant raises, respectively, no evidence and, alternatively, insufficient evidence points concerning the finding of his negligence. In determining the merit of appellant's "no evidence," or legal sufficiency point, we consider only the evidence and inferences tending to support the jury's findings and disregard any contrary evidence and inferences. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Bodine v. Welders Equipment Co.*, 520 S.W.2d 407, 411 (Tex.Civ.App.— Corpus Christi 1975, writ ref'd n.r.e.). We have done so, and we overrule appellant's first point of error.

In reviewing appellant's contention that the evidence is factually insufficient to support the jury's finding, we will review all of the evidence and set the verdict aside if it is against the great weight and preponderance of the evidence and is manifestly unjust. *In re Kings Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1952).

Appellant testified that when he reported to work on May 20, 1976, the day of the accident, he had been in the employ of Southern Pacific for approximately six years. One of the first things he attempted to do that morning was to unload the trailers from the car in question, but noted something amiss with the stanchion. He reported this to his superiors, and the car was "bad ordered," an industry term meaning that something is out of order and awaiting the attention of a repairman.

Appellant then went about his other duties until late that afternoon when, upon receiving instructions from his supervisor, Mr. Bill McCarthy, appellant attempted to lower the still unrepaired stanchion by use of a pipe wrench. He testified that he had lowered stanchions by hand on several previous occasions and had never experienced one collapsing before. Additionally, he had seen other workers do the same, and had never witnessed a stanchion collapse as a result. Appellant had never been warned by representatives of either the railroad or Southern Pacific not to lower a stanchion in this fashion. However, he admitted that he knew that there was something mechanically wrong with this particular stanchion and that he knew he should leave it alone.

Appellant stated that he knew that it was company policy not to work with a piece of equipment once it had been "bad ordered." On cross-examination he confirmed as correct the proposition that once equipment is "bad ordered," it is not safe for either the equipment or the workmen to use it until it has been repaired, but that he went ahead and did so anyway on Mr. McCarthy's order. However, having done the same thing in the past, appellant did not consider the operation dangerous.

Mr. McCarthy testified that *proper procedure would have been to await the arrival of the repairman, but that the customer whose trailer was upon the flatcar wanted delivery, and that he made the decision to lower the stanchion by hand and instructed appellant to get a pipe wrench and do so. He made this decision based upon his knowledge that the procedure was not unsafe. He had never had any warnings not to do so, and stated that he felt personal responsibility for the accident.*

Mr. Trini Guillen had worked for the railroad for 22 years and had been in charge

of its mechanical operations. In response to hypothetical questions he stated that appellant acted improperly in obeying Mr. McCarthy's order, and that Mr. McCarthy acted improperly in issuing the order. It was Mr. Guillen's opinion that appellant could have refused his boss' order without suffering adverse consequences.

Mr. Bruce Flohr, who had been a superintendent for the railroad and acting administrator of the Federal Railroad Administration, was also of the opinion that appellant acted improperly in not awaiting the repairman.

Juan Davilla, a city driver like appellant who had been with Southern Pacific in that position for 17 years, stated that he had never tried to lower a stanchion using a pipe wrench when the socket was missing, but that he would not have seen anything wrong with attempting to do so, and had never been warned against it. Mr. Davilla had successfully lowered stanchions by use of a ratchet type wrench in the past.

■ Contributory negligence is the failure to use ordinary care to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. *Parker v. Highland Park, Inc.,* 565 S.W.2d 512, 520 (Tex.1978). Its very essence requires a knowledge on the part of the actor of the danger to be encountered. Id.; *Kenny v. El Paso Electric Co.,* 371 S.W.2d 777, 780 (Tex.Civ.App.—El Paso 1963, writ ref'd n.r.e.). That knowledge of danger, or appreciation of the peril, consists of actual knowledge, as well as constructive or implied knowledge. *Jackson v. Associated Developers of Lubbock,* 581 S.W.2d 208, 211 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.).

■ The determination of whether peril is appreciated is governed by the same "reasonable foreseeability" standard as is used in determining the existence of proximate cause. *Republic of France v. United States,* 290 F.2d 395, 399 (5th Cir.1961), *cert.* *denied* 369 U.S. 804, 82 S.Ct. 644, 7 L.Ed.2d 550 (1962). In order to be charged with negligence the actor must have reasonably foreseen the resultant consequences, or consequences similar in character. *Otis Elevator Co. v. Wood,* 436 S.W.2d 324, 329 (Tex. 1968); *Genell, Inc. v. Flynn,* 163 Tex. 632, 358 S.W.2d 543, 546 (1962); *Thompson v. Gibson,* 156 Tex. 593, 298 S.W.2d 97, 105 (1957). We are of the opinion that imputing to appellant knowledge that the stanchion might fall based upon the evidence recited is not so against the great weight and preponderance of the evidence as to be manifestly unjust.

We overrule appellant's second point of error.

■ In his third and fourth points of error appellant urges, respectively, no evidence and insufficient evidence points regarding the jury's finding that his negligence was a proximate cause of his injuries. Proximate cause consists of two elements: 1) cause in fact, and 2) foreseeability. *Farley v. M & M Cattle Co.,* 529 S.W.2d 751, 755 (Tex.1975); *Clark v. Waggoner,* 452 S.W.2d 437, 439 (Tex.1970). It is the sufficiency of the evidence to support the latter element that appellant questions here.

■ The foreseeability requirement is met if a person of ordinary prudence exercising ordinary care should have reasonably anticipated and foreseen that the accident, or a similar one, would occur as a natural and probable consequence of his act. *Enloe v. Barfield,* 422 S.W.2d 905, 908 (Tex. 1968). As previously noted, the "reasonable foreseeability" standard used to determine the existence of proximate cause is interchangeable with that employed in determining the existence of negligence. *Republic of France v. United States,* supra. Having already deemed the evidence sufficient to support such a finding in examining appellant's first two points of error, we overrule points numbers three and four.

In his fifth point of error, appellant contends that the trial court "erred in granting the Defendant's Motion for a Directed Verdict and withdrawing from the jury all of

the Plaintiff's special issues pertaining to strict liability in tort." The special issues in question, if answered favorably to appellant, would have imposed strict liability upon the railroad for appellant's injuries.

■ In determining whether a directed verdict should be affirmed, we must determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1968); *Henderson v. Travelers Ins. Co.,* 544 S.W.2d 649, 650 (Tex.1976).

The doctrine of strict liability as enunciated in the Restatement (Second) of Torts § 402A is as follows:

> § 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, *if*
>
> (a) *the seller is engaged in the business of selling such a product,* and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>
> (b) the user or consumer has not brought the product from or entered into any contractual relation with the seller." [emphasis added].

■ In *Rourke v. Garza,* 530 S.W.2d 794 (Tex.1975) the court extended the doctrine to include persons engaged in the business of *leasing* products to third parties. The court held:

> "Rourke Rental next contends that the theory of strict liability is not applicable to the leasing of equipment to an industrial user, as distinguished from a sale of the equipment. We can see no sound

basis for this distinction. Where one is engaged in the business of introducing products into the channels of commerce, he will be subject to strict liability for physical harm caused by such products if they are unreasonably dangerous to the user or consumer *whether he sells or leases his products."* Id. at 800. [emphasis added].

Thus, as a result of *Rourke,* the doctrine of strict liability clearly applies to persons engaged in the business of selling *or* leasing the product in question.

In *Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374 (Tex.1978), the court was confronted, for the first time, with the issue of "whether the doctrine of strict liability in tort applies where the product has not entered the stream of commerce and where there has been no sale of the product by the manufacturer but a bailment for mutual benefit." Id. at 385. The court held that since the product in that case never entered the stream of commerce, the doctrine of strict liability did not apply to its manufacturer. Id. at 377. In so holding, the Court reaffirmed its position that, although strict liability does not depend upon a sale, the *defendant* must in some manner release the product *to the consuming public.* Id. at 376.

■ In the case at bar, we find no evidence that the railroad was engaged in the business of releasing stanchions into the stream of commerce. The railroad merely leased the stanchion from Trailer Train Corp. and, through persons such as the appellant, used it for its intended purpose. We have found no case in which strict liability has been imposed upon a lessee, and we decline to do so here. Although AFC Industries, as the manufacturer of the stanchion, and Trailer Train Corp., as the lessor, were engaged in the business of releasing stanchions into the stream of commerce, they were not joined as defendants. Accordingly, we hold that under the facts of this case, the doctrine of strict liability is *not* applicable. *See Thate v. Texas & Pacific Ry. Co.,* 595 S.W.2d 591, 599 (Tex.Civ. App.—Dallas 1980, writ dism'd by Agr.).

The trial court, therefore, correctly instructed a verdict on the special issues in question. The appellant's fifth point of error is overruled.

Appellant next asserts error in the trial court's refusal to submit the following special issue as he requested:

"Do you find from a preponderance of the evidence that the defendant failed to employ and station in the Rio Grande Valley of Texas a sufficient number of carmen or mechanics to repair cars which were defective or reported 'bad order' within a reasonable period of time after a defect was discovered and reported?"

The evidence showed that Mr. Gus Bustamante was the only railroad mechanic in the Rio Grande Valley, where the accident occurred. It was his job to come and fix railcars which were in disrepair, and he had been notified that the car in question had been "bad ordered" and was in need of his attentions. Mr. Bustamante testified that he knew of several geographic areas served by the same manpower, and that it is not unusual to have one repairman serve the same size area as he does. The evidence also showed that it is not unusual for Mr. Bustamante to "not get there for hours" after a call for his services is put in.

There was no evidence introduced regarding what a "sufficient" number of mechanics for such an area would be other than that of Mr. Bustamante recited supra; nor was there any evidence concerning what a "reasonable" period of time in which to get a railcar repaired would be. There is no error in the trial court refusing to submit a requested issue if there is no evidence raising it. *Garza v. Alviar,* supra, 395 S.W.2d at 824; *Burke Wiley, Inc. v. Lenderman,* 545 S.W.2d 226, 228 (Tex.Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.).

Additionally, when the trial court has submitted issues inquiring about ultimate issues it is not required to submit different shades of the same issues. Rule 279, T.R. C.P.; *Prudential Insurance Co. of America v. Tate,* 162 Tex. 369, 347 S.W.2d 556, 559 (1961). In the instant case the trial court did submit the following special issue:

"Do you find from a preponderance of the evidence that the failure of the Defendant Railroad, its agents and employees, to repair the stanchion in question before the accident occurred, was negligence?"

The jury responded in the negative. We hold that appellant's requested issue, the submission of which was refused, was merely a different shade of the one quoted above. No error is shown in the trial court's actions, and the point is overruled.

In his final two points of error appellant alleges reversible error arising out of jury misconduct, and in the giving of supplemental instructions by the trial court during jury deliberations. As regards the alleged jury misconduct appellant refers specifically to the mentioning of insurance during deliberations; the manner in which the jury answered the comparative negligence issue; and the rendering of "what resembles" a quotient verdict. All grounds relied upon by appellant were raised in his motion for new trial.

In order for jury misconduct to form the basis for the granting of a new trial, it must be shown that the alleged misconduct occurred, and that it probably resulted in harm to the party. *St. Louis Southwestern R. Co. v. Gregory,* 387 S.W.2d 27, 31 (Tex.1965); *Barrington v. Duncan,* 140 Tex. 510, 169 S.W.2d 462, 464 (1943). As regards the mentioning of insurance, some jurors who testified at the hearing on the motion for new trial did not recall hearing the topic being broached. Those who did recall the subject coming up had varying recollections. The estimates on the number of times someone mentioned the possibility of its existence ranged from one to three times. However, all who did recall having heard the topic mentioned agreed that it was done so in passing, and an admonishment that it was not to be discussed or considered was promptly given each time. Generally, the mentioning of insurance, promptly rebuked and abandoned, does not constitute such misconduct as will result in the reversal of a judgment.

*Putman v. Lazarus,* 156 Tex. 154, 293 S.W.2d 493, 494 (1956); *Landreth v. Reed,* 570 S.W.2d 486, 491 (Tex.Civ.App.—Texarkana 1978, no writ).

The evidence adduced at the hearing on the motion for new trial shows that in finding that the accident was 5% attributable to the negligence of the railroad and 95% to the negligence of appellant, the jury reached the 5% figure first and then, after much haggling, subtracted that figure from 100% to reach the percentage figure attributable to appellant. They did this despite the fact that some of them felt that negligent acts of others not party to the suit were in part responsible. However, in doing so they were obeying the instructions accompanying the issue to the effect that they should make their answer add up to 100%. The record reveals no objection by appellant to this instruction as submitted. He has therefore waived any complaint regarding the jury's compliance therewith. Rule 274, T.R.C.P.

As regards appellant's contention that the jury rendered what "resembles" a quotient verdict, there is no evidence of such in the record. A quotient verdict is one resulting from an agreement among the jurors to be bound by a figure determined by adding the sums they individually think proper and dividing that total by the number of jurors. *Landreth v. Reed,* supra, 570 S.W.2d at 490. We assume that appellant here refers to the fact that the amount reported to the trial court by the jury as appellant's damages represented 5% of the total damages found. However, the jury's apportionment of negligence precludes appellant from any recovery whatever. Having already refused to disturb that apportionment, we view this complaint as being moot. Appellant's seventh point of error is overruled.

Finally, the record reveals the following communications passing between the jury and the court during deliberations:

*September 5, 1980, 11:23 a.m.*

"Judge: Do we have to answer Special Issue Number 17. Please advise." Signed Foreman, Noe Salinas.

*11:30 a.m.*

"In regard to your question which the Court received about 11:23 a.m. this day, you should read and follow the instruction preceding Special Issue Number 17." Signed George W. Storter, Judge Presiding.

*12:15 p.m.*

"Judge: We have a hung jury." Signed Foreman, Noe Salinas.

*12:25 p.m.*

"In reply to your note received about 12:15 p.m., the Court suggests that the jury recess for a noon meal, and on reconvening, give the matter more consideration. If you recess for noon, all records and exhibits should be left with the bailiff for safe keeping. Remember the admonishments, do not discuss the case while separated, or mingle with others, or accept favors." Signed George W. Storter, Judge Presiding.

*2:15 p.m.*

"Judge: We have voted unanimously not to answer Special Issue Number 17, as presented." Signed Foreman, Noe Salinas.

*2:37 p.m.*

"In response to your note received about 2:15 p.m., the Court asks you to consider the matter further. Please again consider the instruction preceding Special Issue Number 17 and consider the issue further." Signed George W. Storter, Judge Presiding.

*3:47 p.m.*

The jury announced through the bailiff that they had reached a verdict.

Even though there is a latent danger of coercion, supplemental, verdict-urging instructions are not, in and of themselves, erroneous, so long as the particular charge given is not otherwise objectionable. *Stevens v. Travelers Insurance Co.,* 563 S.W.2d 223, 229 (Tex.1978). While passing upon the validity of such a charge, we will consider all of the circumstances surrounding the rendition and effect of the verdict-urging instruction. Id. We have read the series of communiques as a whole and con-

sidered them in light of all of the surrounding circumstances, and decline to invalidate the actions of the trial court. Id.

Appellant's eighth point of error is overruled, and the judgment of the trial court is AFFIRMED.