Timothy C. McWILLIAMS et al., Appellants,

v.

SNAP–PAC CORPORATION, Appellee.

No. 15748.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

Oct. 28, 1971.

Rehearing denied Jan. 6, 1972.

On Second Rehearing Feb. 10, 1972.

Third Rehearing Denied March 3, 1972.

Harrison & Taylor, Al Taylor, Houston, for appellant Timonthy C. McWilliams.

Tom Alexander, D. Michael Dalton, Houston, for appellants Transport Ins. Co. and Robertson Tank Lines, Inc.; Butler, Binion, Rice, Cook & Knapp, Houston, of counsel.

Fulbright, Crooker & Jaworski, Jerry V. Walker, Arno W. Krebs, Jr., Hugh E. Hackney, Tom Connally, Houston, for appellee.

BELL, Chief Justice.

This is an appeal from a judgment rendered against appellant McWilliams as plaintiff when appellee's motion to withdraw the case from the jury and render judgment for appellee was sustained at the conclusion of McWilliams' evidence. Also as appellants are Robertson Tank Lines, herein called Robertson, and Transport Insurance Company, herein called Transport. Transport and Robertson, through the same counsel, filed a pleading denominated "Intervention". Transport sought recovery, by way of subrogation, of the amount it had paid McWilliams in workmen's compensation benefits. Robertson sought to recover for damages caused to its tank truck. The court held Robertson's cause not properly before the court as it was a separate cause of action; that no service had been obtained on appellee, and that appellee had not entered its appearance as to Robertson's cause.

McWilliams sued appellant for damages resulting to him when he was unloading some hydrocarbon substance from Robert-

son's tank truck into a storage tank of appellee located on an oil and gas field operated by appellee which was located near a place in south Texas named Yancy. While the substance was being pumped a fire occurred resulting in burns to McWilliams and damage to the truck. The incident occurred April 23, 1964.

McWilliams sought recovery on the grounds that the substance that he was unloading was highly volatile, which he did not know, and he was never warned of the fact. Further, he asserted appellee breached its duty to furnish safe unloading equipment and facilities.

Appellee originally filed an answer consisting of a general denial and pleas of contributory negligence and unavoidable accident. By trial amendment, filed at the conclusion of McWilliams' evidence, appellee plead McWilliams voluntarily exposed himself to a risk known to him or that he was charged with knowledge, open and obvious danger, and further there was no duty on appellee to warn McWilliams because of his own knowledge of the danger or that his employer had knowledge and this was imputable to McWilliams.

Robertson is a large transportation company hauling all types of cargo including petroleum products. At all times material to this case a Mr. Elias was Assistant Terminal Manager and as such was in charge of all operations in the area with which we are concerned. Corpus Christi was its headquarters for the area. He would receive orders for products to be transported and dispatch trucks to transport the products.

Beginning in February 1964 Robertson had been transporting to appellee's oil and gas fields near Yancy a product referred to at places in the record as "Residue B-5". In other places it is referred to as B. S. and W., meaning bottom scum (or sediment) and water. This meant it was a substance taken from the bottom of tanks. The designation "B-5 Residue" was an internal company designation by Celanese

that conveyed no meaning to the ordinary person.

When sometime in February 1964 the first order for delivery was called in by Celanese it was received by Mr. Elias. He did not know what B-5 Residue meant. He called Celanese and made inquiry about the nature of the substance so he could determine if any special equipment was needed. The only equipment specially needed was a pressure type vehicle. The Celanese representative made the remark, "It would be just like handling gasoline".

After the first delivery was made in February until the time of the injury to McWilliams, there were several other deliveries made by drivers other than McWilliams. Sometime during this intervening period Elias received reports from other drivers that "There were a lot of fumes in the air, and there were some pumping problems. They needed a better way of getting the stuff off of the trailers." This information came from the drivers who made the first two deliveries, the drivers being Talley and Carroll.

After receiving the complaints, Elias called the Snap-Pac operating lease office at Hondo and Yancy and asked for Mr. Duncan. He understood that Duncan was "field foreman". The bills of lading issued by Celanese and delivered to Robertson's drivers on March 12, showed consignment to "Snap-Pac Corporation, c/o Rudolph Duncan, Gray Wilson Unit, 5 miles North of Yancy, Texas. In Case Driver Is Unable to Locate He Is to Call Yancy, Texas, Mr. Duncan 5672271, Or Unable to Locate Can Call Hondo, Texas. Plant Phone 6-3558." The quoted information was also on the bill of lading of March 14. The bill of lading of April 17 showed consignment to "Snap-Pac Corporation, c/o Rudolph Duncan, Sharpe Lease, 4 Miles North of Yancy, Texas on Farm Road 462." The one of April 20 gave the same information as that of April 17, as did the one of April 22. It was under the April 22 bill of lading that McWilliams made delivery. All

bills of lading in evidence show "Tank Truck Mixed Petroleum Hydro-Carbons (Residue B–5)." Mr. Elias testified that he also obtained information on how to contact the Snap-Pac lease by talking with someone at Celanese.

We here note that appellee objected to the testimony of any conversation allegedly had between Elias and Duncan who was allegedly the agent of Snap-Pac. The ground of the objection was that it was hearsay. The court, after first excluding it, later admitted it.

Elias testified that after the complaints from Talley and Carroll he called for Duncan at Hondo. When someone answered the telephone, Elias started relating the problem to him. The person talking to him stated, "You need to talk to Duncan; he is the field supervisor." Duncan was not there so Elias called the number at Yancy that was given on the bill of lading. Someone answered and Elias asked for Duncan. Another person came to the telephone and said, "This is Duncan." Elias identified himself and told Duncan about the problem of fumes that were there because of the receiving tank being uncovered, and asked Duncan to get a lid for the tank. Duncan told Elias that "he would take care of the thing."

A Mr. Baker, former attorney for McWilliams, testified that in January 1965 he went to the lease to investigate the explosion. There he met a Mr. Duncan, who with others identified themselves as Snap-Pac employees.

The evidence further shows that all shipments were received and paid for by Snap-Pac.

Appellee urges there was no admissible evidence showing it had any knowledge of the dangerous conditions, but that evidence does show that Robertson had superior knowledge as did McWilliams. It asserts it had no duty to warn because of this, and the dangerous condition was open and obvious and that McWilliams voluntarily assumed the risk. The evidence is material on these issues and on contributory negligence.

The basic rule is that to bind a corporation with an admission made by an alleged agent, or a promise made by him or by information imparted to him, such person must be shown to be the agent and acting within the scope of his authority. This proof may be supplied by circumstantial evidence.

We are of the view that the evidence recited above makes a prima facie case of agency and scope of authority on the part of Duncan. Celanese consigned the materials to Snap-Pac in care of Duncan on several occasions prior to the date of the fire. The materials were received and paid for by Snap-Pac. The bills of lading showed that if Robertson's drivers had trouble locating the lease Duncan should be called. The telephone numbers where he could be reached were given. Elias called those numbers. He asked for Duncan. A person identifying himself as Duncan talked to Elias. Further, later on Mr. Baker met a Mr. Duncan on the lease where the fire occurred. Circumstantially Duncan was proven to be Snap-Pac's agent with authority to do what was reasonably necessary to facilitate delivery which would include having available facilities to induce Robertson to complete delivery. Duncan's statement to Elias that he "would take care of the thing" was therefore admissible. Garrison v. Great Southern Life Insurance Company, 72 S.W.2d 692 (Tex. Civ.App.), writ dism'd; Hines v. Chaddick, 63 S.W.2d 263 (Tex.Civ.App.), writ dism'd; Southwestern Telegraph & Telephone Co. v. Luckett, 60 Tex.Civ.App. 117, 127 S.W. 856, n. w. h.; Gulf, C. & S. F. Ry. Co. v. Looney, 51 Tex.Civ.App. 381, 115 S.W. 268, n. w. h.; Missouri, K. & T. Ry. Co. et al. v. Brown et al., 155 S.W. 979 (Tex.Civ.App.), writ ref.

Further, since in this case knowledge and belief or a state of mind of Elias

and McWilliams is material to the cause of action, the statement attributed to Duncan would be admissible. In Section 799, Texas Law of Evidence by McCormick and Ray, this is stated:

> "Communications made or received by a person will often be relevant not as evidencing the facts are as stated . . . but as tending to show knowledge or belief of the person who communicated the statement or the one who received it. Particularly, the knowledge or belief of a litigant at a decisive moment is often a component of his cause of action or ground of defense . . . Such statements are consistently received if they would tend to induce or indicate a belief material to the case . . . Likewise, he may use a statement showing his belief that a promise would be carried out when his reliance is material . . . "

See also Waters-Pierce Oil Co. v. Davis, 24 Tex.Civ.App. 508, 60 S.W. 453, n. w. h., and McAfee v. Travis Gas Corp., 137 Tex. 314, 153 S.W.2d 442.

Mr. Elias never told McWilliams anything about there having been trouble with fumes or about the unloading facilities or that it should be handled like gasoline.

After McWilliams received the order on April 22 he went to Celanese which is located at Bishop about 32 miles from Corpus Christi. He was to be there about 1 P.M. His manifest showed the product to be hauled was "B–5 Residue". He had never hauled it before. Before he went to Celanese he inquired of some other drivers, but they had never hauled any. Those who had were not there. Elias told him he thought "it was the bottom of their tanks in the plant, just a B S and W. bottom—low volatant." Celanese loaded his tank. The loading was done by use of a rubber hose attached to a metal pipe. He was directed by Celanese to tie the hose into the open hatch on his tank. This was done. He then laid the lid on the hatch. This left an opening the width of the hose which would be about two inches. He waited until he was told the loading was completed. He then took the hose out, closed the hatch and proceeded to Corpus Christi. He saw the substance and it had the appearance of a mixture of half coffee and half cream. It also looked like oil you put in your car though somewhat lighter. It had a sweet sickening smell. He did not notice any vapors coming off. The next morning he took the load to its destination. When he got to Yancy he headed north on FM Road 462. He thought he was near the lease and noticed a young man following him. He pulled to the side of the road and the young man drove up and asked him if he had some "stuff for us" and McWilliams answered he did for Snap-Pac. The young man said he would direct him to the location. This the young man did. They, after traveling a short distance, crossed a cattle guard and drove near what turned out to be the receiving tank. The young man directed McWilliams where to park the truck. There were some pipes at one location that he was told he could not run over. The result was that the truck was parked headed approximately northwest and was northwest of the receiving tank. The receiving tank and the tank of the truck were about the same height. McWilliams asked the young man if Snap-Pac had a pump and received the response that it did not have a workable one but McWilliams would have to use his own and pump the substance over the top of the receiving tank. The young man then went over to the plant about 300 yards away.

Arrival at the lease was about 7:00 A.M. The weather was clear. While the prevailing wind is from the southeast, McWilliams said there was no wind that morning. Appellant got the hose on his truck and connected it to his pump on the tank truck and put the other end of hose in the open manhole on top of the receiving tank. The tank has no lid. There was no vent pipe on the tank, though there was a place on it where a pipe could have been screwed in that would serve as a vent. Cost to do this would not exceed $35. Even if there had been a lid it would not

fit on the manhole because of two pipes extending partially over it. Such a vent would serve to carry any vapors into the atmosphere above and away from the unloading site. How far away would depend on the dimensions and manner of alignment. Appellant then went to the diesel engine in the truck part of the transport vehicle and set it to run at 700 R.P.M., the point proper to furnish power to pump the fluid into the receiving tank. He did not notice too many fumes—"no more than would be expected of anything like that." Pumping went normal for from three to five minutes. The diesel motor then speeded up slightly and then suddenly speeded up to 1750 to 1800 R.P.M. McWilliams stated "I knew I was in trouble right there." He ran to the tank of the truck and shut off the master valve to stop the flow. It was located about two feet behind the ladder on the truck and would be just in the front of the tank. He turned it off just by the flip of a lever. He then ran to the opposite side of the truck to try to take the pump out of gear. He was not going to try to turn the motor off because it would have done no good. It would have kept going because it was running on lighter fumes than the diesel fuel in the truck tank. When he started to open the front door of the cab so he could take the pump out of gear there was a flash. He was burned. There was an air breather on the right side of the truck. After the flash or explosion, he ran. There were two or three explosions.

Appellant had worked for Robertson about five years before the accident. He had hauled all types of cargo, including petroleum products such as propane, butane and gasoline. He had operated a filling station. He had previously hauled all types of petroleum products for Cactus Petroleum for 7½ years. For 9 months he had hauled liquid petroleum gas for Wanda Petroleum. He understood the operation of a diesel engine. He knew some petroleum products gave off fumes. He had never hauled B–5 Residue before. When he heard the diesel motor racing he knew it

was getting external fuel which he figured was vapors. He knew if there was a spark and there were vapors in the air a fire or explosion was going to occur. When he heard the motor racing he could have run away. He chose to disconnect the valve and to try to disengage the pump. He knew the diesel operated in such a manner that it had the air intake and the combustion of the air and the fuel was what made the motor speed up. If he had a load of gasoline he would not unload it as he did the cargo he had. If he had known he was hauling anything explosive he would not have hooked up. He didn't know the type of petroleum product it was. Some of them will burn and some will not.

Mr. Trimble, former Director of Safety for Robertson, went to the site of the fire to investigate with a view to determining the cause of the fire. He arrived on the day the fire occurred. He was looking for a source of ignition. It had to be heat or a spark. The possibilities would be the electrical system on the truck that would produce a spark; the engine is operating at high temperature, and, the rotating equipment in operation of the pump could produce a spark. Further, he testified the breather or air intake on the diesel supplied the oxygen to mix with the fuel so combustion will result upon a spark or heat being supplied. If volatile fumes get in the breather while the engine is running, the engine will "run away". This overfueling could cause flames to come out of the exhaust. Hydrocarbons vary as to volatility. B. S. & W. are of low volatility and give off few vapors and sometimes none.

In unloading the liquid hydrocarbons it could be by a pump near or remote from the receiving tank that a person in Snap-Pac's position would furnish that would be connected with the receiving tank and the delivering vehicle could be tied into such pump. There could be a lid for the manhole that when put in place over the delivering hose would minimize the escape of vapors, particularly if there was a vent

pipe such as we have previously mentioned. There could be a "dip tube" placed below the level of the fluid. The vapors are increased by the splashing of the liquid.

There was evidence from a chemist who testified that the term "hydrocarbon" covered a wide classification of materials that are comprised principally of hydrogen and carbon. He testified the description of the material given on the bills of lading were rather "nondescript". It is ambiguous and could mean practically anything. To him as a chemist he could tell by noticing the weight per gallon and relate it to specific gravity and determine it was similar to naptha. "Now, naptha is gasoline." In this way he would know the product was very volatile and would give off a lot of fumes.

The testimony of Elias shows his conversation about difficulty with fumes in connection with unloading, and the unloading equipment was inadequate. It further shows that Snap-Pac from sometime in February 1964 until the fire in April had received and used some 6,000 gallons of B–5 Residue about every 10 days. It is true there is no evidence that Snap-Pac had ever had any mishap in use of the substance. It, however, seems inconceivable to infer that Snap-Pac was not acquainted with the high volatility of the substance with which its employees had worked for a substantial period of time. There is no evidence that Snap-Pac had any knowledge of the operating peculiarities of a diesel engine.

Appellee, as one ground to support the trial court's judgment, relies primarily on Delhi-Taylor Oil Corp. v. Henry, Tex., 416 S.W.2d 390, in which our Supreme Court held that while the occupier of premises owes a duty to an invitee to warn of any dangerous conditions that exist on the premises that are not open and obvious, and of which the invitee or his employer do not have knowledge, that duty is discharged when the occupier makes full disclosure of the dangerous condition to any employer of an employee who is injured as a result of the dangerous condition. Appellee also says it owed McWilliams no duty to warn because Robertson, his employer, and McWilliams had superior knowledge of the danger. Of course, if appellant or his employer had superior knowledge of the danger there was no duty to warn.

■ Under the evidence which we have rather fully noticed, Robertson at one time knew that the substance should be handled like gasoline and also knew that the unloading facilities at the Snap-Pac lease were such that fumes were, during unloading operations, somewhat extensive and these facts and the nature of the diesel engine created a danger such as that causing the injury. McWilliams never personally knew of the volatile nature of the substance or the fact that previous drivers had complained of excessive fumes during unloading operations. If the accident had occurred when such full knowledge of the danger was possessed by Robertson, Delhi-Taylor and other cases cited by appellee would control and appellee would have no duty to warn. Robertson's knowledge would be imputed to McWilliams. However, these facts changed. Elias called Duncan, appellee's representative, and told him of the trouble with the fumes and unloading equipment, and stated there should be a lid on the receiving tank. Duncan told him he would take care of it. Elias had a right to rely on this statement. Appellee then had the duty to furnish the equipment or warn that it had not done so. It did neither. The result is that when McWilliams was dispatched to the lease Robertson was not in full possession of all facts that created the danger. It knew the product should be handled like gasoline, but it did not know the continued condition of the unloading facilities. We, therefore, reach the conclusion that appellee had a duty to warn Robertson that the unloading facilities were unchanged so knowledge of the danger could not be imputed to McWilliams.

McWilliams did not know that the substance he unloaded should be handled like gasoline. He knew the condition of the loading facilities. However, this condition was not in itself dangerous. The danger lay in pumping a highly volatile substance in the tank that would likely produce excessive fumes. He did not know the substance was highly volatile. We cannot say as a matter of law that the danger was open and obvious and therefore appellee had no duty to warn of it.

Appellee urges that the rule of volenti non fit injuria precludes recovery as a matter of law. The cases of Halepeska v. Callihan Interests, Tex., 371 S.W.2d 368; Wood v. Kane Boiler Works, 150 Tex. 191, 238 S.W.2d 172, and Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S. W.2d 60, all by our Supreme Court, fully discuss the doctrine. The effect of these decisions is that where a party has full knowledge of and appreciates a particular danger and voluntarily encounters the danger as a result of an intelligent choice, there can be no recovery. He will be held to have consented. The danger may be so open and obvious as to charge the person with knowledge and appreciation as a matter of law. Under the facts of this case we cannot say as a matter of law that the dangerous condition that caused the injury reached that quality.

Appellee says, however, that certainly when the engine started running away McWilliams knew the danger and he should, as he could have, run to safety instead of seeking to shut off the pump. It relies on Robert E. McKee, General Contractor v. Patterson, 153 Tex. 517, 271 S. W.2d 391, which held that economic compulsion would not excuse voluntary exposure to the risk. There it appeared that the injured party knew well in advance of encountering the risk what the risk was and he deliberately chose to encounter it. In this case the appellant was suddenly confronted with an emergency situation. He had, or at least one could reasonably infer, no time for reflection, so that it can-

not be said as a matter of law that he voluntarily chose to encounter the risk.

Since the cause is to be reversed and remanded as to all parties, it is unnecessary to discuss the points raised by Transport and Robertson.

Reversed and remanded.

On Motions for Rehearing

The motions for rehearing of Snap-Pac, Transport Insurance Company and Robertson Tank Lines, Inc. are all overruled.

We will merely write on the motions of Transport Insurance and Robertson insofar as they complain that the trial court held they were not before the court on their alleged petition in intervention.

The suit was filed by McWilliams, an employee of Robertson, against Snap-Pac to recover for injuries suffered by him. The suit in nowise put in issue any rights of Robertson whose transport truck was damaged. Transport Insurance was properly allowed to intervene to recoup the workmen's compensation it had paid McWilliams. However, Transport and Robertson sought through intervention to recover for the damage to the truck. This was the assertion of a separate independent cause of action. No citation was issued for or served on Snap-Pac. These alleged intervenors merely delivered a copy of the petition to Snap-Pac. Snap-Pac never made an appearance as to this intervention. The position of Transport and Robertson is that they had a right to intervene under Rule 60, Texas Rules of Civil Procedure, subject to the intervention being stricken, and that under Rule 72, T. R.C.P., the only notice required is delivery of a copy to the opposite party who has answered, or his attorney.

We are unable to agree with such position under the facts of this case.

Rule 60 does, we think, allow intervention by one who would be a proper party, subject to the right of the court to strike the intervention. However, to inter-

vene and obtain service by merely delivering a copy of the petition, presupposes that the intervenor has some interest in the recovery sought by a party to the suit or in protecting its rights against some asserted liability. Rule 72 provides that delivery of the copy of a pleading, motion, etc., suffices where the character of the pleading, etc., is such as "is not by law or these rules required to be served upon the adverse party." Where a third party comes into a suit and asserts a separate independent cause of action, he must obtain service of citation in the absence of a waiver or appearance.

A discussion of the nature of intervention may be found in 24 Tex.Jur.2d, Sections 40–44, pp. 190–196, and 1 McDonald, Texas Civil Practice, Sections 3.46–3.47. This intervention is of a nature that requires service of citation.

### On Second Motion for Rehearing

COLEMAN, Justice.

Robertson Tank Line, Inc., has filed its Second Motion for Rehearing complaining that this court erred in holding that a party who intervenes in a suit asserting an independent cause of action for property damage growing out of the same events forming the basis of the original suit for damages by reason of personal injury must secure service of citation, where the party against whom the cause of action is asserted fails to answer. This motion for rehearing is granted.

In this instance the driver of a truck owned by Robertson was injured in an explosion and fire which also damaged the truck. The driver sued Snap Pac alleging that his injuries were caused by the negligence of Snap Pac. The original action was filed December 23, 1964. Transport filed a petition in intervention on April 26, 1966, and gave notice of its action as required by Rule 72, T.R.C.P. The case was set for trial on May 25, 1970.

Prior to the examination of the jury panel at a hearing in chambers, Snap Pac represented to the court that Robertson was not correctly before the court, and was not a proper party to intervene in the suit. The court ruled that Robertson's plea in intervention was "not before the court," and refused to permit its attorney to participate in the trial. The court recited this action in its judgment, and stated that the cause of action alleged by McWilliams and the statutory subrogation claim of Transport Insurance Company "proceeded to trial." No other judgment or order was entered disposing of Robertson's plea in intervention.

Rule 40, T.R.C.P., provides that all persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all of them will arise in the action. The cause of action alleged by Robertson clearly falls within this rule. Hindman v. Texas Lime Company, 157 Tex. 592, 305 S.W.2d 947 (1957). Since Robertson could have joined in filing the original suit under Rule 40, supra, certainly it was a proper party to intervene in the suit by virtue of Rule 60, T.R.C.P.

Rule 60 provides:

"Any party may intervene, subject to being stricken out by the court for sufficient cause on the motion of the opposite party; and such intervenor shall, in accordance with Rule 72, notify the opposite party or his attorney of the filing of such pleadings within five days from the filing of same."

There is no contention that the intervenor failed to give notice of the petition in accordance with Rule 72. It is argued that the intervenor was "not before the court" because of its failure to have a citation issued and served on the defendant. Robertson has intervened in the cause as authorized, and in the manner provided, by Rule

60. No motion to strike was filed. No "sufficient cause" for striking the intervention is suggested. No order severing the intervention from the main cause was entered.

The trial court erred in finding that this intervenor had no standing to participate in the trial of the case, and this court was in error in holding service of citation necessary under the facts of this case. Snap Pac had answered the plaintiff's petition before the plea in intervention was filed. Professor McDonald states the correct rule in this language:

"Citation is necessary when the intervenor asks affirmative relief against a defendant who has not appeared or a plaintiff who does not, by any action subsequent to the intervention, appear thereon. It also is necessary as against any third party sought to be brought in by intervention. But parties before the court must take notice of the intervention when they are notified under Rule 72. As noted in § 7.56, a defendant who has answered must answer an intervention seeking affirmative relief against him without awaiting further citation." 1 McDonald, Texas Civil Practice, § 3.50.

PEDEN, J., joins in this opinion.

BELL, C. J., dissents.

On Second Motion for Rehearing

BELL, Chief Justice (dissents).

I respectfully dissent from the holding made in the majority opinion on second motion for rehearing that no citation was necessary on the petition in intervention filed by Robertson and Transport Insurance against Snap Pac. My views are sufficiently stated in my opinion on first motion for rehearing.