**TERMINIX, INC. and Terminix International, Inc., Appellants,**

v.

**RIGHT AWAY FOODS CORPORATION, INC.,**
**Appellee.**

**No. 13–87–549–CV.**

Court of Appeals of Texas, Corpus Christi.

May 18, 1989.

Rehearing Denied June 15, 1989.

Charles W. Hury, Atlas & Hall, McAllen, Karen L. Zuercher, Thornton, Summers, Biechlin and Dunham, San Antonio, John Milano, Jr., Lynn E. Coleman, San Antonio, for appellants.

Michael W. Gordon, James F. Buchanan, Kleberg & Head, Corpus Christi, Roy Dale, Richard L. Bilbie, Brownsville, for appellee.

Before NYE, C.J., and KENNEDY and DORSEY, JJ.

## OPINION

KENNEDY, Justice.

Terminix, Inc. and Terminix International, Inc. (Terminix) appeal a judgment against them and in favor of Right Away Foods Corporation (RAF), for damages resulting from Terminix's fumigation of RAF's packaging and food processing facilities with the chemical Phostoxin. A jury found that the damages were proximately caused by the gross negligence of Terminix and the ordinary negligence of the phostoxin supplier, Industrial Fumigants, and assigned the comparative degrees of negligence 80% to Terminix and 20% to Industrial Fumigants. The jury failed to find a third defendant, Degesch America, Inc. (Degesch), manufacturer of the chemical phostoxin, liable for RAF's damages under theories of either negligence or strict products liability. The jury assessed actual damages in the amount of $63,824.19 and exemplary damages in the amount of $250,000.00. Judgment was rendered on the verdict that RAF recover from Terminix 80% of its actual damages, or $51,059.35, plus prejudgment interest in the amount of $37,711.96 and full exemplary damages of $250,000.00, totalling $338,771.31. Terminix appeals by eleven points of error, challenging the legal and factual sufficiency of the evidence to establish Terminix's liability, complaining that the evidence proved as a matter of law or by the great weight and preponderance that the negligence of RAF and Degesch contributed to RAF's damages, and asking for a remittitur of the actual and exemplary damages. We reverse that portion of the judgment awarding exemplary damages and affirm the remainder of the trial court's judgment.

RAF contracted with Terminix through Jack Brewer, manager of Terminix's Harlingen office, to do a fumigation job at RAF's food processing plant in McAllen, Texas. RAF manufactures rations for the armed forces, and a representative of the United States Air Force requested that phostoxin be used for the fumigation. Phostoxin is a pesticide which comes in tablet form. When the tablets are left exposed in the area to be fumigated, they emit a deadly gas called phosphine.

Brewer testified that he is certified by the Structural Pest Control Board of Texas as a licensed pest control applicator. He stated that he has used phostoxin eight to twelve times in the past, and that he has had eight and a half to eleven years experience in the pest control business. His expertise comes mainly from on-the-job training under the supervision of Vernon Walters, presently an owner of Industrial Fumigants. Walters, who also testified at trial, has used phostoxin since the late 1960's and has frequently been called upon as a consultant to supervise its application.

Brewer testified that this was the biggest phostoxin job that he had ever done, that he needed professional assistance, and that, in exchange for buying the phostoxin from Industrial Fumigants, he wanted Walters to advise him on the job. Brewer further testified that he tried to get authorization to hire Walters as a consultant, but Terminix did not have time to process the authorization before the job began, so the relationship remained informal. Walters testified, however, that he had offered his services as a supervisor to Brewer, but that Brewer said that it wasn't necessary.

A couple of weeks before the fumigation, Brewer personally measured the dimen-

sions of the building at 1000′ by 300′ by 22′, or 6,600,000 cubic feet. Brewer gave these dimensions to Walters to calculate the amount of phostoxin needed to do the job, and Walters ordered an amount based on that volume. Brewer testified that he did not double check his measurements prior to fumigation.

Walters later found that the dimensions that Brewer gave him were incorrect, the building was really only half the volume he had used to calculate the phostoxin dosage, and therefore the dosage should have been half the amount of phostoxin used.

Brewer testified that he knew phosphine may react with certain metals such as copper, brass, silver and gold, and that a combination of excessive concentration, high temperature and high humidity would cause corrosion of these metal. The danger of high concentrations of phosphine reacting with these metals at high temperatures and humidity was confirmed by the testimony of Vernon Walters and Jeremiah Sullivan, president of Degesch, who holds a Ph.D. in Pharmaceutical Chemistry and is a certified fumigator in the states of Virginia and North Carolina.

Walters testified that regulating the phostoxin dosage is the only practical way to prevent corrosion and that temperature readings in the 90 degree range are considered high for purposes of application of phostoxin. Sullivan testified that the amount of phostoxin used by Brewer was twice the amount needed for a building the size of the RAF warehouse and that this dosage would cause a high concentration of phosphine. Sullivan further testified that corrosion may occur with temperatures in excess of 90 degrees, humidity in the 80% range, and a concentration of 725 parts per million, the highest recorded during the present fumigation.

The fumigation lasted for 72 hours, from Friday evening through Monday, with RAF employees returning to work on Tuesday. Brewer testified that he took a temperature reading when he started the job and thereafter monitored temperature by a thermometer on the outside of the building. Weather reports entered into evidence show temperatures ranged between 61 and 93 degrees during the period of the fumigation. Brewer also testified that he took phosphine concentration readings which were within the limits specified by Degesch, and that he showed his readings to Walters once during the fumigation. Walters testified that, when Brewer approached him about the concentration readings, Walters found them to be "up to the point that is scary," because of the danger of corrosion. Although Walters had used concentrations that high in the past, he had not used those concentrations around equipment that might corrode, as here. Walters testified that he was not certain these concentrations were high enough to corrode the equipment because he could not predict the exact point at which corrosion would occur; he was dealing rather in safety margins.

As for the preparation of RAF's warehouse before the fumigation, Sullivan testified that those in charge should have removed everything that was removable and either sprayed fixed objects with a protectant or wrapped them with polyethylene, which phosphine will penetrate minimally during an average fumigation. Walters testified that if he had been in charge of the fumigation, he would have removed all of the office equipment that could be removed, and been very careful with the building measurements and the dosage. Walters further stated that, if the building had been prepared properly, the damage would not have occurred.

Brewer testified that, before RAF prepared the warehouse for fumigation, he took Walters through the plant, including the office area, the warehouse and the lab. Brewer stated that Walters recommended that they remove the photographic film and paper, telephones, computers, the copy machine, and anything with copper or silver contacts, and that they use 4-mil plastic bags, which RAF subsequently furnished, to cover things that couldn't be removed. Brewer further stated that Walters told him all the electrical and electronic equipment should be removed if possible.

Walters testified that he went through the office area with Brewer and told him that certain electrical equipment, including typewriters and calculators, could be damaged and should be removed, but Walters did not go into the plant because Brewer did not ask him to. Walters also testified that he never told Brewer to use 4–mil bags, because phosphine will go right through them and be retained in the bag. After the brief walk-through, Brewer did not ask for any more advice from Walters before applying the phostoxin.

Before the fumigation, Brewer had a meeting with all the RAF supervisors to explain how they should protect their equipment and what could happen if items were not protected. Brewer assured RAF that he would use extreme caution and consideration so that nothing would be harmed.

Brewer claims that he told RAF to remove everything possible before the fumigation, including specifically the security system control unit, the copy machine and paper, and those machines with copper contacts. Brewer further stated that he gave RAF a written list of everything that should be removed or covered and how it should be accomplished.

David McNally, RAF vice president and manager of operations, testified that Brewer said it was necessary to protect materials with copper, brass and silver in them from exposure to phosphine, and Brewer specifically warned them to protect delicate equipment like electronics by removing what they could and using 4–mil plastic bags to protect what could not be removed. Brewer also advised the computer manager to remove the computer terminals. However, when McNally mentioned to Brewer that the plant had a great deal of electrical and electronic equipment with brass and copper in it, Brewer said that they did not have to be concerned about phosphine damage to the larger equipment because the connectors were so big and heavy that it was "like two freight cars bumping into each other and connecting." Brewer specifically indicated that the fumigation would not damage the electric motors.

Also, RAF did not do anything to protect the Copy Data equipment, based on Brewer's opinion that it was not that delicate.

Billy Ashcraft, the safety and security director for RAF, testified that Brewer said the jet coater, the security cameras and monitors, and the locks didn't need to be removed, just wrapped, and that they wouldn't have any problem with the motors and their wiring or the copying machine. Humberto Cavazos, vice president and general manager of the freeze dry division, testified that Brewer said the larger pieces of equipment, the motors, the strapping and sealing machines, and the jet coater would not be effected by the fumigation and did not have to be removed.

Upon returning to work after the fumigation, RAF employees noticed such substantial corrosion damage to the equipment left in the warehouse that RAF hired a consultant, Robert McGaughey, to investigate the damages caused by the fumigation and estimate the loss. McGaughey testified that he had 29 years experience appraising property damages before being called for the present appraisal. McGaughey in turn hired Frank Sartor, a consulting engineer with a B.S. in chemical engineering, to determine the cause and extent of the corrosion damages at the warehouse. Sartor submitted to McGaughey a report of his findings and his opinion that the cause of the corrosion was exposure to high concentrations of the fumigant phostoxin, under conditions of high temperature and high humidity. Based on Sartor's report and his own investigations, McGaughey estimated a loss of $54,666.97 for equipment and $9,185.34 for the building itself, or $63,852.31 in total.

By points of error one through four appellants complain of the legal and factual sufficiency of the evidence to support the jury's answers to Special Issues 1, 2 and 3. In considering a "no evidence", "insufficient evidence" or "against the great weight and preponderance of the evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985);

*Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Allied Finance Co. v. Garza*, 626 S.W.2d 120 (Tex. App.—Corpus Christi 1981, writ ref'd n.r. e.); and Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L.Rev. 361 (1960).

By Special Issue 1 the jury found Terminix negligent in failing either to give an adequate warning of the potential corrosive effects of phostoxin, to give adequate instructions concerning preparations for the use of phostoxin, to take the precautions against damages that a reasonably prudent certified applicator would take, or to properly apply phostoxin. By Special Issue 2 the jury found that Terminix's negligence was a proximate cause of actual damages to RAF, and by Special Issue 3, that Terminix's conduct was reckless, wanton and grossly negligent.

■ We first discuss points of error three and four, which pertain to negligence, as opposed to gross negligence. There was evidence that Terminix's local agent, Brewer was negligent in two broad categories: first, he applied the phostoxin at too high a concentration for the warehouse equipment to be safe from corrosion; second, he failed adequately to instruct RAF personnel on how to protect their equipment against phosphine.

Appellants claim that the concentration never exceeded a safe range. Walters and Sullivan gave expert testimony about the application of phostoxin. They testified that the exact point at which phosphine starts to corrode exposed metals is uncertain. However, their testimony also suggests that a prudent applicator would avoid the range in which corrosion is likely. In addition, common sense indicates that a prudent applicator would not have miscalculated the cubic area of the space to be fumigated, or, at least, would have rechecked his measurements before fumigation, considering the consequences of a miscalculation. There is sufficient evidence to show that Brewer was negligent in his use of twice the normal quantity of phostoxin, and that his negligence proximately caused RAF's damages by creating conditions favorable for corrosion within the warehouse. *See Goodpasture, Inc. v. S & J Farms, Inc.*, 528 S.W.2d 99, 101 (Tex.Civ.App.—El Paso, 1975, no writ).

■ The evidence also suggests that Brewer did not make a reasonable effort to prepare RAF's warehouse for the fumigation. Walker and Sullivan testified to the measures that the applicator should have taken to protect the equipment within the warehouse. The testimony of McNally, Ashcraft and Cavazos shows that appellant failed even to recommend these measures to RAF. Appellants claim that it was appellee's duty to protect its own equipment. However, appellee relied upon Brewer's expertise in the minimal preparations they took. Brewer had a duty to warn and protect RAF against dangers associated with the use of the phostoxin which would not be readily apparent to RAF. *See McWilliams v. Snap-Pac Corp.*, 476 S.W.2d 941 (Tex.Civ.App.—Houston [1st Dist.] 1972, writ ref'd n.r.e.). There was sufficient evidence to show that Brewer was negligent in failing properly to instruct RAF on the precautions to take before fumigation, and that his negligence proximately caused much of the equipment to be left exposed to phostoxin and the resulting damages.

Under either of the above theories there was legally and factually sufficient evidence for the jury to find that appellants, through Brewer, were negligent and that their negligence was the proximate cause of appellee's damages. Appellant's third and fourth points of error are overruled.

By their first and second points, appellants complain that the evidence was legally and factually insufficient to support the jury's finding that Terminix, through Brewer, was grossly negligent.

■ Gross negligence is defined in Texas as that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it. *Williams v. Steves Industries, Inc.*, 699

S.W.2d 570, 572 (Tex.1985); *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 917 & 920 (Tex.1981); *Farm Services, Inc. v. Gonzales*, 756 S.W.2d 747, 753 (Tex.App.—Corpus Christi 1988, writ denied).

■ What lifts ordinary negligence to gross negligence is the mental attitude of the defendant. The plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care. A mental state may be inferred from actions. All actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in deciding if there is some evidence of gross negligence. *Williams*, 699 S.W.2d at 573; *Burk Royalty*, 616 S.W.2d at 922. The plaintiff may prove a defendant's gross negligence by showing either that he had actual knowledge that his conduct created an extreme degree of risk, or that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others. *Williams*, 699 S.W.2d at 573. "Conscious indifference" denotes a decision, in the face of an impending harm to another party, to not care about the consequences of the act which may ultimately lead to that harm. *Williams*, 699 S.W.2d at 573.

■ In the present case, though there is ample evidence that Brewer was negligent both by his use of twice the normal quantity of phostoxin and in failing properly to instruct RAF on the precautions to take before fumigation, there is no evidence either that he had actual knowledge, or that under the surrounding circumstances a reasonable person would have realized, that his conduct created an extreme degree of risk to the safety of others. Appellants' first and second points of error are sustained.

By their tenth and eleventh points of error appellants complain that the trial court erred in submitting an issue on exemplary damages and in failing to suggest a remittitur of the $250,000 in the exemplary damages found by the jury on the grounds that they were excessive. Our disposition of points one and two is dispositive of these points as well and we do not address them.

■ By their fifth and sixth points of error, appellants complain of the trial court's failure to grant a new trial based on the jury's failure to find Degesch liable in Special Issues 8 and 11. Appellants contend that they proved as a matter of law or, alternately, by the great weight and preponderance of the evidence that Degesch either failed to give, or was negligent with respect to providing, an adequate warning of the corrosive effects of phostoxin or adequate instructions concerning preparations for its use.

Appellants do not dispute that Degesch provided warning labels, introduced into evidence at trial, which were printed on the phostoxin containers and warned under a section on "Environmental Hazards" that:

> [Phosphine] may, however, react with certain metals such as copper, brass, silver and gold and cause corrosion, especially at high temperatures and humidity. Precautions should be taken to protect materials made from such compounds including some types of copying paper and undeveloped film.

In addition, instructions for use supplied with the phostoxin warned that, "[phosphine] is corrosive to copper and precious metals. Electrical outlets and other copper-containing items should be covered for protection. Sensitive equipment should be removed from the structure prior to fumigation."

Moreover, as the label itself states, phostoxin is a "restricted use pesticide" that is intended "[f]or retail sale to and use only by Certified Applicators or persons under their direct supervision and only for those uses covered by the Certified Applicator's certification."

Appellants contend, however, that these warnings were inadequate because they did not indicate specific measures that should be taken to protect materials from the fumigant, nor did they indicate how hight the temperature, humidity and concentration had to be before corrosion would occur. Appellants also contend that Degesch should have included an additional warning

that the dosage of phostoxin be reduced when it is used in periods of high temperature and high humidity.

Whether the manufacturer's warning label on a product is adequate in view of the user and the circumstances is a question for the fact finder. *Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 592 (Tex. 1986); *Dixon v. Van Waters and Rogers,* 674 S.W.2d 479, 481 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.). In the present case, Degesch's labels and literature clearly warned the user about the risk of corrosion damage to equipment containing copper, brass, gold or silver under conditions of high temperature and high humidity. That Degesch could have given more specific warnings does not show as a matter of law or by the great weight and preponderance that the warnings actually provided were inadequate. Appellants' fifth and sixth points are overruled.

By their seventh and eighth points of error appellants complain of the trial court's failure to grant a new trial based on the jury's failure to find RAF liable in Special Issue 15 or attribute any percentage of causation to RAF in Special Issue 17. Appellants contend that they proved as a matter of law or, alternately, by the great weight and preponderance of the evidence that RAF was negligent in the protection of its equipment and facilities, and therefore should have been allocated a percentage of the comparative causation of its damages.

Appellants point to the testimony of McNally that Brewer told RAF supervisors to protect delicate pieces of equipment with copper or brass in them against exposure to the fumigant by removing as much as possible and bagging the rest in 4-mil plastic. Appellants also point to Brewer's testimony that RAF had not satisfactorily protected certain equipment when he made his final walk-through before fumigation. Appellants contend that, since appellee failed to take responsibility for protecting its own equipment as Brewer instructed, appellee was contributorily negligent to some degree.

However, McNally and Ashcraft testified that they took the precautions which Brewer recommended for removing and bagging equipment in the warehouse, but they also relied on Brewer's representations that certain items did not need to be protected. Their testimony also suggests that Brewer never informed them of any faults in their preparations during his final walk-through before fumigation.

■ Contributory negligence, like negligence generally, is the failure to use ordinary care to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. *Parker v. Highland Park, Inc.,* 565 S.W.2d 512, 520 (Tex. 1978); *Hernandez v. Southern Pacific Transportation Co.,* 641 S.W.2d 947, 951 (Tex.App.—Corpus Christi 1982, no writ). It requires a knowledge and appreciation on the part of the actor of the danger to be encountered. *Hernandez,* 641 S.W.2d at 951; *Jackson v. Associated Developers of Lubbock,* 581 S.W.2d 208, 211 (Tex.Civ. App.—Amarillo 1979, writ ref'd n.r.e.). However, one's conduct in proceeding after having knowledge of the danger is not always negligent. There are other considerations such as the nature of the danger, the alternatives available, and the precautions taken which bear upon the reasonableness of the actions. *Parker,* 565 S.W.2d at 520; *Gulf States Utilities Co. v. Dryden,* 735 S.W.2d 263, 267 (Tex.App.—Beaumont 1987, no writ).

■ Although appellee was aware of the general danger of corrosion posed by the fumigant, aside from what Brewer told its supervisors, appellee did not know the extent of that danger to specific pieces of equipment or the precautions necessary to prevent corrosion. Viewing the evidence most favorably to appellee, it took all precautions against this danger that Brewer advised and relied upon Brewer as an expert in the field. The evidence fails to show either as a matter of law or by the great weight and preponderance of the evidence that appellee was contributorily neg-

ligent in the protection of its equipment and facilities. Appellants' seventh and eighth points of error are overruled.

■ By their ninth point of error appellants complain that the trial court erred in failing to grant a new trial or remit the actual damages awarded in Special Issue 25, on the grounds that the evidence was legally and factually insufficient to sustain the award. In their brief, appellants specifically complain only that there was no evidence or insufficient evidence to show that two strapping machines had to be replaced due to corrosion damage from the fumigant.

The warehouse had two strapping machines that bind the cartons in which RAF packs its product by pulling a strap around the carton, heat-sealing it, and cutting the excess strap off. RAF employees noticed that the machines were not working properly after the fumigation and that there was some corrosion of the parts, which they removed and cleaned. Afterward, however, they continued to have problems with the stapping machines. RAF asked Sartor, McGaughey's chemical engineering consultant, to investigate and verify that corrosion was causing problems with the strapping machines.

Appellants point to Sartor's testimony that, in his opinion, these problems were not caused by corrosion to the machines, but that, after plant personnel had removed and cleaned corrosion of the parts, they put the machines back together out of adjustment. Sartor testified that, at the time he left the plant, the proper adjustments had been made and the strapping machines were working properly.

Cavazos, however, testified that in his day to day experience around the strapping machines after the fumigation he noticed corrosion of the inner copper parts which prevented the strapping machines from properly feeding and sealing the strap, and that he had to replace many of the parts which started to break down from corrosion. Even after Sartor had inspected the strapping machines and found them to be in good order, Cavazos noticed that they were not performing properly and that,

"we could not get a hundred percent out of our equipment at that point." This caused delays in production, which soon required RAF to replace the strapping machines.

McGaughey testified that, in the process of an appraisal he determines what can be repaired and what should be replaced by visual inspection and watching the equipment operate. In the present case, he visited the warehouse on nine separate days, because much of the damage to pieces of machinery was not immediately apparent but revealed itself only gradually when parts began to fail and the machines had to be disassembled. McGaughey's estimated total loss of $63,852.31, based on the results of his own inspection as well as Sartor's report, included $25,500.00 for replacement of the two strapping machines. By its answer to Special Issue 25, the jury apparently accepted this estimate as accurate.

We hold that there is legally and factually sufficient evidence to support the jury's award of actual damages. Appellant's ninth point of error is overruled.

The judgment of the trial court awarding exemplary damages in the amount of $250,000 against appellants is reversed and judgment is here rendered that no exemplary damages be recovered. The remainder of the judgment of the trial court is affirmed.

DORSEY, J., concurs.

DORSEY, Justice, concurring.

I concur in the opinion of the Court that there is no evidence to support the finding of gross negligence; however, I disagree with the majority as to which element of gross negligence is lacking evidentiary support.

Gross negligence is that entire want of care which would raise the belief that the act or omission complained of was the result of conscious indifference to the welfare or right of another. *Williams v. Steves Industries, Inc.*, 699 S.W.2d 570, 572 (Tex.1985). In the instant case, the injury complained of is the corrosion of copper parts in various machines. Al-

though the fumigant phostoxin is a poisonous chemical, no personal injuries were suffered. The risk to which Terminix exposed the appellee was a risk to the equipment of appellee during fumigation. The risk of corrosion was heightened by high humidity and high temperatures within the warehouse and the excessive amount of phostoxin.

The mental state of Mr. Brewer, Terminix's manager and applicator, is the determining factor. Although there is no direct evidence that Brewer knew of the heightened corrosive attributes of phostoxin under conditions of high humidity and high temperatures, he admitted reading the label to acquaint himself with the dangers. Warnings on the label and literature clearly advised caution because of the increased potential for corrosion by the chemical as the temperature and humidity increased. I find some evidence of his knowledge of the risk. Even if Brewer did not know those risks of phostoxin, he should have known them. He was an applicator certified by the Texas Structural Pest Control Board and phostoxin is a fumigant whose distribution is limited to certified applicators because of the toxicity and dangerousness of the product.

However, there is no evidence that he was consciously indifferent to those risks of corrosion. In reviewing the legal sufficiency of the evidence, we look only at the evidence that tends to support the jury's conclusion and disregard all evidence to the contrary. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). To aid in our review of the evidence that tends to support the "conscious indifference" element, several facts are argued by appellee: Brewer's failure to measure the building a second time, his failure to ascertain the temperature and humidity inside the building prior to and during fumigation, his giving incorrect advice of how best to protect the equipment, and Terminix's failure to hire Vernon Walters, a recognized expert with fumigants, as a consultant for the fumigation. During fumigation, Brewer took readings of the concentration of the toxin and conferred with Walters, who testified he told Brewer one reading of several

taken was "on the high side," although not alarming. Brewer took no action to reduce the concentration.

Evidence of "some care" does not negate "such an entire want of care" required in gross negligence cases. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 921 (Tex.1981). Nonetheless, there is no evidence, viewed in the light most favorable to the plaintiff/appellee, that Brewer was consciously indifferent to the risk or, more simply, that he did not care.